UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

<table>
<tr><td>

In re:

APPLESEED'S INTERMEDIATE
HOLDINGS, LLC, *et al*,

     Debtors
_____

ROBERT N. MICHAELSON, as
Trustee of the Appleseed's
Litigation Trust,

     Plaintiff,

  v.

JEFFREY D. FARMER, et al.,

     Defendants.

</td><td>

Chapter 11

Case No. 11-10160 (KG)

HONORABLE JOSEPH E. IRENAS

CIVIL ACTION NO. 11-807
(JEI/KMW)

**OPINION**

</td></tr>
</table>

**APPEARANCES:**

DRINKER BIDDLE & REATH LLP
Howard A. Cohen
1100 North Market Street
Suite 1000
Wilmington, DE 19801
    Counsel for Plaintiff

BLANK ROME LLP
Elizabeth A. Sloan
1201 North Market Street
Suite 800
Wilmington, DE 19801
    Counsel for Defendants Jeffrey D. Farmer, Bradford J.
Farmer, Brent Bostwick, and Vito Kowalchuk

RICHARDS, LAYTON & FINGER, PA
Drew Gerard Sloan, Robert J. Stearn, Jr. and Mark David Collins
One Rodney Square
920 N. King Street
Wilmington, DE 19801

1

Counsel for Golden Gate Defendants (Defined below)

MORRIS JAMES LLP
Carl N. Kunz, III
500 Delaware Avenue, Suite 1500
P.O. Box 2306
Wilmington, DE 19899
    Counsel for Defendant Karinn Kelly

PEPPER HAMILTON, LLP
David M. Fournier
1313 market Street, Suite 5100
P.O. Box 1709
Wilmington, DE 19899
    Counsel for Defendants Webster Capital Founders Fund LP,
Wester II LLC and Webster III LLC


**IRENAS**, Senior District Judge, sitting by designation:

Plaintiff Michaelson brings claims as Trustee of the Appleseed Litigation Trust formed pursuant to a Chapter 11 reorganization.  The claims revolve around a complicated financial transaction, which allegedly caused Appleseed Intermediate Holdings LLC and affiliated debtors (collectively "Debtors")[1] to become insolvent.  Presently before the Court, each Defendant moves to dismiss or partially dismiss.  (Dkt. Nos. 19, 21, 23, 25)  In addition, Plaintiff moves to seal certain

---

[1] The Debtors are Appleseed's Intermediate Holdings LLC, Inc. ("Appleseed's Intermediate"); Appleseed's Acquisition, Inc.; Appleseed's Holdings, Inc.; Arizona Mail Order Company, Inc.; Bedford Fair Apparel, Inc.; Blair Credit Services Corporation; Blair Factoring Company; Blair Holdings, Inc.; Blair International Holdings, Inc.; Blair LLC; Blair Payroll, LLC; Draper's & Damon's Acquisition LLC; Draper's * Damon's LLC; Fairview Advertising LLC; Gold Violin LLC; Haband Acquisition LLC; Haband Company LLC ("Haband"); Haband Oaks, LP; Haband Online, LLC; Haband Operations, LLC; Johnny Appleseed's, Inc.; Linen Source Acquisition LLC; LM&B Catalog, Inc.; Monterey Bay Clothing Company, Inc.; Norm Thompson Outfitters, Inc.; NTO Acquisition Corporation; Orchard Brands Insurance Agency LLC; and Wintersilks, LLC.

portions of his answering brief.  (Dkt. No. 32)

## I.

On January 19, 2011, the Debtors filed voluntary Chapter 11 petitions in Bankruptcy Court.  On April 14, 2011, the Bankruptcy Court confirmed the Joint Plan of Reorganization of Appleseed's Intermediate Holdings LLC and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code (the "Plan").  Certain claims, however, were transferred to the Appleseed's Litigation Trust. The Trustee, Robert Michaelson, has the exclusive right, authority and standing to investigate and prosecute those claims. The instant dispute revolves around an acquisition and dividend recapitalization allegedly orchestrated by the Private Equity Parties (hereinafter "PE Parties")[2] in 2007 that caused the Debtors' insolvency.

At the time of the transaction, Appleseed's Intermediate was a wholly owned subsidiary of Orchard Brands Corporation (formerly known as Appleseed's Topco, Inc.) (hereinafter "Orchard Brands"),

---

[2] The PE Parties are made up of the following entities: Golden Gate Private Equity, Inc. (together with affiliated investment funds, "Golden Gate"); Golden Gate Capital Management II, LLC; GGC Administration, LLC; Orchard Brands Corporations (formally known as Appleseed's Topco, Inc.); Orchard Brands Topco LLC; Catalog Holdings, LLC; Catalog Holdings, LLC - Series B (Draper's); Catalog Holdings, LLC - Series C (Appleseed's); Catalog Holdings, LLC - Series D (NTO); Catalog Holdings, LLC - Series E (Haband); Golden Gate Capital Investment Fund II, LP; Golden Gate Capital Investment Fund II (AI), LP; Golden Gate Capital Associates II-QP, LLC; Golden Gate Capital Associates II-AI, LLC; CCG AV, LLC; CCG AV, LLC - Series C (GGC Co-Invest); CCG AV, LLC - Series I (Bain); CCG AC, LLC - Series K (K&E); CCG AC, LLC - Series K.

which, in turn, was a wholly owned subsidiary of Orchard Brands Topco LLC.  Investment funds managed by Golden Gate, specifically all series of Catalog Holdings, owned a 68.4% stake in Orchard Brands Topco and, therefore, indirectly owned the Debtors.  (*See* Compl. ¶ 14-15, 49)

On January 23, 2007, BLR Acquisition Corporation, an entity formed by Golden Gate, and Orchard Brands, entered into a merger agreement with Blair Corporation ("Blair").  (*Id.* at ¶ 50) Blair's shareholders were paid $42.50 a share for a total merger price of approximately $158 million.  (*Id.*)

The Blair acquisition was a leveraged buyout.  (*Id.* at ¶ 51) In other words, the PE Parties borrowed funds secured by Blair's assets to finance the transaction.  However, the PE parties did not merely borrow $158 million to finance the LBO, but instead used the transaction to facilitate a dividend recapitalization. (*Id.* at ¶ 52)  The dividend recapitalization would allow the PE Parties to realize an immediate return on investment without selling their equity stake by causing a wholly owned subsidiary to pay a large dividend up the corporate structure.  (*Id.* at ¶ 53)

To finance the transaction, the PE Parties engaged American Capital Strategies, Inc. and UBS Securities LLC (collectively "Lenders") to secure $710 million of senior credit facilities ("Senior Credit Facilities").  (*Id.* at ¶ 54)  As collateral, the

4

PE Parties offered all of the Debtors' assets.  (*Id.*)

To garner support for the loans, the PE Parties allegedly knowingly calculated unreasonably optimistic financial projections.  (*Id.* at ¶¶ 114-128)  Potential lenders received glowing growth projections, but internally, the PE Parties estimated that the levels of sustainable debt for Blair and the Debtors were far more conservative.  (*Id.*)  These inflated projections allowed the PE Parties to secure a larger loan and, therefore, a larger dividend.

The PE Parties then gave the inflated projections to Duff & Phelps, LLC to secure a third party solvency opinion.  (*Id.* at ¶ 129)  Plaintiff alleges that the Duff & Phelps projections made unreasonable comparisons and relied upon faulty factual assumptions provided by the PE Parties. (*Id.* at ¶¶ 129, 143) Although Duff & Phelps opined that Orchard Brands would remain solvent, Duff & Phelps gave no opinion regarding the solvency of Appleseed's Intermediate or its subsidiaries - the companies immediately affected by the issuance of the dividend.  (*Id.* at ¶ 132)

After securing the financing, the PE Parties selected Haband Company LLC ("Haband"), a wholly owned subsidiary of Appleseed Intermediate, to pay the dividend.  (*Id.* at ¶¶ 52, 59)  On April 26, 2007, the day before Haband's board met to declare the dividend, the PE Parties replaced two of Haband's directors with

Joshua Olshansky, managing director of Golden Gate, and T. Neale Attenborough, a director and officer of Orchard Brands. (*Id.* at ¶ 58) The replacement directors were allegedly insiders because they had a financial interest in the dividend. (*Id.*)

At the meeting of April 27, 2007, the Haband directors unanimously approved the $310 million dividend to be paid to Appleseed's Intermediate, which Appleseed's Intermediate would pay to Orchard Brands. (*Id.* at ¶ 59) In turn, Orchard Brands would pay the dividend to certain preferred shareholders including Minority Shareholder Defendants[3] and Catalog Holdings.[4] (*See* Tr. Oral Arg., Feb. 22, 2012) Catalog Holdings, funds managed by Golden Gate, disbursed the dividend to private equity investors. (*Id.*)

Immediately following the meeting, the Haband directors were reinstated. (Compl. ¶ 64) Plaintiff alleges that the temporarily replaced directors would not have voted for the dividend had they not been replaced. (*Id.* at ¶ 65)

On April 30, 2007, the transaction closed. (*Id.* at ¶ 67) Of the $650 million of newly acquired funds (other funds were

---

[3] These Defendants include Jeffrey D. Farmer, Bradford J. Farmer, Brent Bostwick, Karinn Kelly, Vito Kowalchuk, Charles Slaughter (personally and in his capacity as Trustee of the Charles Lewis Slaughter Trust), Christian Feuer, Geralynn Madonna, and Jim Brewster.

[4] At oral argument, the parties expressed some confusion as to whether the dividend ultimately reached Orchard Brands Topco before disbursement. The distinction is not dispositive to these Motions. The Court merely notes here that these are facts that should not be in dispute.

advanced or available in cash), $310 million went to the dividend, $158 went to Blair's shareholders, and $138 million paid off existing debt. (*Id.* at ¶ 72)  Relatively small remaining sums were used to pay transaction and financing fees. (*Id.*)  According to data contained in the Closing Sources & Uses, the Lenders transferred the loan proceeds directly to the beneficiaries. (*Id.* at Ex. A)  In other words, the parties bypassed the administrative hassle of transferring the dividend through each corporate rung of the ladder. (*Id.*)

On April 30, 2007, the PE Parties used their domination and control to require the Debtors to enter into an advisory agreement in which the Debtors paid large "advisory fees" to the PE Parties. (*Id.* at ¶ 81)  The Debtors were required to pay these fees regardless of whether they received financial or consulting services in exchange. (*Id.* at ¶ 83)  Although the Debtors were not required to pay the fees if it would cause a default, the Debtors made fee payments just months before declaring bankruptcy. (*Id.* at ¶ 81)

Shortly after the 2007 transaction, the Debtors could not afford payments on the loans. (*Id.* at ¶ 112)  In order to avoid default, the Debtors used the Payment In Kind ("PIK") feature of the loan agreements, which allowed the Debtors to add missed payments to the principal. (*Id.*)  Had it not been for this feature, the Debtors would have declared bankruptcy earlier.

(*Id.*)

On June 8, 2007, Standard & Poor's Rating Services ("S&P") issued high risk credit ratings to the Debtors and the Senior Credit Facilities.  (*Id.* at ¶ 148)  S&P specifically noted the highly leveraged capital structure and other elements of the 2007 transaction as the main cause for the rating.  (*Id.*)

The Debtors own audited balance sheet over the calendar year of 2007 showed equity of $95 million before the transaction and a deficit of $279 million afterwards.  (*Id.* at ¶¶ 155-56)  Although assets increased, liabilities increased faster.  (*Id.*)  Indeed, the $310 million dividend accounts for a substantial portion of the decline in the Debtors' net worth.  (*Id.* at ¶ 160)  The lack of liquidity due to the dividend made the Debtors more vulnerable to unexpected challenges, including the recession.[5]  (*Id.* at ¶ 167)

On April 27, 2011, Michaelson filed this adversary proceeding in Bankruptcy Court.  On December 15, 2011, this Court withdrew the reference to Bankruptcy Court.  Each Defendant now moves to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) made applicable to this adversary proceeding pursuant to Bankr.R. 7012(b).

---

[5] Although Defendants blame the Debtors' insolvency on the recession, Plaintiff alleges that the 2007 transaction caused the Debtors' insolvency. At this stage in the litigation, the Court may not look beyond the Complaint to infer that the recession, and not the transaction, caused the Debtors' insolvency.

## II.

Federal Rule of Civil Procedure 12(b)(6) provides that a court may dismiss a complaint "for failure to state a claim upon which relief can be granted."  In order to survive a motion to dismiss, a complaint must allege facts that raise a right to relief above the speculative level.  *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007); *see also* Fed. R. Civ. P. 8(a)(2).

While a court must accept as true all allegations in the plaintiff's complaint, and view them in the light most favorable to the plaintiff, *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008), a court is not required to accept sweeping legal conclusions cast in the form of factual allegations, unwarranted inferences, or unsupported conclusions.  *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997).  The complaint must state sufficient facts to show that the legal allegations are not simply possible, but plausible.  *Phillips*, 515 F.3d at 234.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 566 U.S. 662, 129 S.Ct. 1937, 1949 (2009).

When evaluating a Rule 12(b)(6) motion to dismiss, the Court considers "only the allegations in the complaint, exhibits

attached to the complaint, matters of public record, and documents that form the basis of a claim." *Lum v. Bank of America*, 361 F.3d 217, 221 n.3 (3d Cir. 2004). A document that forms the basis of a claim is one that is "integral to or explicitly relied upon in the complaint." *Id.* (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)).

For claims of fraud, "a party must state with particularity the circumstances constituting fraud." Fed.R.Civ.P. 9(b); Bankr.R. 7009 (adopting Rule 9 for adversary proceedings). "Rule 9(b) exists to insure adequate notice so that defendants can intelligently respond." *Illinois Nat. Ins. Co. v. Wyndham Worldwide Operations, Inc.*, 653 F.3d 225, 233 (3d Cir. 2011). Defendants should be able to "answer, engage in discovery, and move for summary judgment." *Id.*

Although trustees are generally afforded some leeway because they lack personal knowledge, a complaint must do more than merely identify the allegedly fraudulent transaction. *Walker v. Posteur (In re Aphton Corp.)*, 423 B.R. 76, 85 (Bankr.D.Del. 2010). To adequately allege fraudulent intent in the absence of direct evidence, a plaintiff may plead circumstantial evidence, or badges of fraud, that permit the inference of fraudulent intent. *See Zazzali v. Swenson (In re DBSI, Inc.)*, 2011 WL 1810632, *2 (Bankr.D.Del. 2011).

10

The parties do not dispute that the heightened pleading standard applies to allegations of actual fraud.  With regard to the allegations of constructive fraud, however, courts are split. *See, e.g., OHC Liq. Trust v. Nucor Corp. (In re Oakwood Homes Corp.)*, 325 B.R. 696, 698 (Bankr.D.Del. 2005) ("There is no question that Rule 9(b) applies to adversary proceedings in bankruptcy which include a claim for relief under §§ 544 or 548, whether it is based upon actual or constructive fraud."); *but see Charys Liq. Trust v. McMahan Sec. Co., L.P. (In re Charys Holding Co., Inc.)*, 443 B.R. 628, 632 n.2 (Bankr.D.Del. 2010) ("Plaintiffs' constructive fraudulent transfer claims are governed by Rules 8 and 12(b)(6) and not the heightened Rule 9(b) pleading standard.")  Because the distinction does not change the result in this case, the Court will apply the heightened pleading standards of Rule 9(b) to allegations of both actual and constructive fraud.

### III.

The Complaint alleges sixteen Counts.  Not all Defendants, however, have moved to dismiss the same Counts on the same grounds.  The FBK Defendants,[6] and Defendant Kelly by joinder, move to dismiss Counts I-IV (avoidance of fraudulent transfers as

---

[6] The FBK Defendants are comprised of minority shareholders of Orchard Brands: Jeffrey Farmer, Bradford Farmer, Brent Bostwick, and Vito Kowalchuk.

to the dividend) and Count XI (corporate waste).  The Golden Gate Defendants,[7] move to dismiss: (1) Counts I-IV; (2) Counts V-VIII (avoidance of fraudulent transfers as to the transaction and advisory fees); and, (3) Counts IX-XII (state law claims for breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, corporate waste, and conspiracy).[8]

Defendants advance several arguments in support of dismissing the fraudulent transfer claims (Counts I-VIII).  The Court will first address those arguments then proceed to the state law claims.  Lastly, the Court will address Plaintiff's Motion to Seal.

### A.

Relevant to this case, "the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim."  11 U.S.C. § 544(b)(1). Defendants make several arguments for dismissal based on this

---

[7] The Golden Gate Defendants are all PE Parties (except the Webster Defendants defined *infra*) as well as Stefan Kaluzny and Joshua Olshansky (co-managing directors of Golden Gate and directors of Orchard Brands) and Jim Brewster and Geralynn Madonna (minority shareholders of the PE Parties).

[8] The FBK and Golden Gate Defendants have filed their own Motions to Dismiss.  The FBK Defendants join Part II of the Golden Gate Defendants' Motion, Karinn Kelly joins both Motions and Defendants Webster Capital Founders' Fund, LP, Webster II, LLC, Webster III, LLC (PE Party Defendants, collectively hereinafter "Webster Defendants"), and Charles Slaughter join the Golden Gate Defendants' Motion only.

statutory language and several arguments based on related statutory requirements.  *See, e.g.,* 11 U.S.C. §§ 546(e), 550(a)(2).

## 1.

First, Defendants argue that there was no "interest of the Debtors in property" because the Senior Credit Facilities required Debtors to pay the dividend.[9]  *See* 11 U.S.C. § 544(b)(1).  In other words, Debtors did not have control over the funds because they were legally required to pay the dividend.[10]  Defendants note that shortly after signing the loan instruments, the Lenders wired funds directly to Orchard Brands.  Therefore,

---

[9] All Defendants have joined this argument.

[10] Defendants primarily rely on non-binding and inapposite case law surrounding the Eleventh Circuit's control test.  *See 3V Capital Master Fund Ltd. V. Official Comm. Of Unsecured Creditors of TOUSA, Inc. (In re TOUSA)*, 444 B.R. 613, 648 (S.D.Fla. 2011) (citing *Tolz v. Barnett Bank of S. Fla. (In re Safe-T-Brake of S. Fla., Inc.)*, 162 B.R. 259, 365 (Bankr.S.D.Fla. 1993).  There, a parent transferred newly borrowed funds to a subsidiary for the express purpose of repaying existing debt.  The Court held that the subsidiary did not have an interest in property because: (1) the subsidiary could not designate the beneficiary of the funds, and (2) the subsidiary could not actually disburse the funds to that party.  In so holding, the Court noted that "[t]o conclude otherwise would confer on the Committee a windfall at the expense of a valid antecedent lender who was innocent of any intent to diminish the assets of the debtor."  *Id.* at 648.

First, *TOUSA* does not control the outcome here because the Third Circuit has not adopted the control test.  Second, this case is inapposite because it involves a subsidiary paying a dividend up the corporate ladder resulting in insolvency - not a parent using a subsidiary as a conduit to pay off existing debt as in *TOUSA*.  Third, were this Court to apply the control test, the elements have been satisfied: (1) Haband's board voted to approve the dividend, (2) only Haband can issue or disburse its own dividend.  Finally, the policy behind the holding of *TOUSA* is wholly inapplicable to this case.  Defendants were not innocent antecedent lenders, but allegedly self-interested owners that sacrificed subsidiaries to enrich themselves.

Haband and Appleseed Intermediate never took possession of the funds.

In support of this argument, Defendants have attached the loan agreements to the Motion.  Generally, Courts may not consider extraneous documents in deciding a motion to dismiss for failure to state a claim.  One exception is when the document is explicitly relied upon in the complaint.  *See Angstadt v. Midd-West Sch. Dist.*, 377 F.3d 338, 342 (3d Cir. 2004).

Here, Plaintiff mentions and relies upon the Senior Credit Facilities throughout the Complaint.  (*See, e.g.,* Compl. ¶¶ 54, 90-113); *see also In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) ("Plaintiffs cannot prevent a court from looking at the texts of the documents on which its claim is based by failing to attach or explicitly cite them."). Plaintiff's Complaint cites liberally to the Senior Credit Facilities and, therefore, will be considered on this Motion to Dismiss.  (*See* Compl. ¶¶ 54, 90-113)

The Senior Credit Facilities, however, provide little support for Defendants' argument.  An interest of the debtor in property encompasses "that property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings."  *See Begier v. I.R.S.*, 496 U.S. 53, 58 (1990) (interpreting the similarly phrased statutory antecedent to interest of the debtor in property broadly).

14

Had Appleseed Intermediate and its subsidiaries decided not to issue the dividend, Debtors would have retained the loan proceeds and the money would have been property of the estate. Although the Golden Gate Defendants argue that the Lenders would not have issued the loans absent payment of the dividend, *see* Tr. Oral Arg., Feb. 22, 2012, the argument has no merit.  The Lenders' loans would have been in a stronger position if the Debtors had more working capital.  Even if the ambiguous Senior Credit Facilities would technically have been in default were Haband not to pay the dividend, any rational creditor would have forgiven default to obtain a stronger financial position for free.[11]

Moreover, although Defendants received the dividend directly from the Lenders, Haband issued the dividend.  (*See* Compl. Ex. A) If, as the Golden Gate Defendants argue, Haband had no choice but to issue the dividend, then Golden Gate would not have allegedly temporarily replaced Haband's directors to ensure board approval. It truly defies logic to argue that Haband did not have an interest in property in the $310 million dividend Haband itself

---

[11] Although payment of the dividend was arguably required by Section 3.12, the payment of the dividend was not a condition precedent to securing the loans.  Decl. Sander Bak Ex. 2, $335,000,000 Credit Agreement § 3.12.  The dividend did arguably breach a condition precedent under Section 4.02(b), however, which requires that "at the time of and immediately after giving effect to such Credit Extension and the application of the proceeds thereof, no Default shall have occurred and be continuing on such date."  *Id.* at § 4.02(b).  Plaintiff alleges that the dividend caused the Debtors to become insolvent.  The Golden Gate Defendants' argument that certain clauses of the Senior Credit Facilities should be read in isolation to relieve Debtors of an interest in property is unpersuasive.

issued.[12]

As alleged, the PE Parties diverted nearly half of the loan proceeds to themselves, which left the Debtors teetering on the brink of insolvency.  It would be paradoxical to allow the PE Parties to offer Debtors' property as collateral, abscond with the proceeds of the loan in the form of a dividend, and yet declare that the Debtors had no interest in property. Accordingly, the Motion to Dismiss will be denied with respect to the argument that there was no interest of the debtor in property.

## 2.

Second, FBK Defendants argue that Plaintiffs have failed to allege facts sufficient to demonstrate that the transfers are "voidable under applicable law."  11 U.S.C. § 544(b)(1). Although no applicable law is specifically alleged in the Complaint, the parties have briefed the Delaware Uniform Fraudulent Transfer Act ("DUFTA").[13]  A transfer is fraudulent under the DUFTA if the debtor made the transfer or incurred the obligation:

> (1) With actual intent to hinder, delay or defraud any creditor of the debtor; or

---

[12] Perhaps this reason accounts for the dearth of case law on the issue.

[13] The Parties have preserved future conflict of law challenges.

> (2) Without receiving a reasonably equivalent value in
> exchange for the transfer or obligation, and the debtor:
>> a. Was engaged or was about to engage in a business
>> or a transaction for which the remaining assets of
>> the debtor were unreasonably small in relation to
>> the business or transaction; or
>> b. Intended to incur, or believed or reasonably
>> should have believed that the debtor would incur,
>> debts beyond the debtor's ability to pay as they
>> became due.

6 Del.C. § 1304(a).  The Statute lists several nonexclusive factors, or badges of fraud, to facilitate an analysis of actual intent.[14]  The FBK Defendants argue for dismissal of both the actual and constructive fraudulent transfer claims.

**a.**

Claims of actual fraud are analyzed under the first subsection.  *See* 6 Del.C. § 1304(a)(1).  The FBK Defendants argue that Plaintiff has failed to allege that both parties to the transaction had actual intent.  Alternatively, the FBK Defendants argue that Plaintiff has not alleged sufficient badges of fraud to establish actual intent because any allegations are directed only to the Golden Gate Defendants.

First, this argument misconstrues the plain language of the statute.  A transfer is fraudulent "if the debtor made the transfer or incurred the obligation with actual intent to hinder,

---

[14] Examples include whether the transfer was to an insider, the debtor was insolvent or became insolvent shortly after the transfer was made, or the transfer occurred shortly before a substantial debt was incurred.  *See, e.g.,* 6 Del.C. §§ 1304(b)(1), (9), (10).

17

delay or defraud any creditor of the debtor." 6 Del.C. §
1304(a). The only relevant intent is that of the debtor. *See,
e.g., Charys Liq. Trust*, 2010 WL 2774852, *4 (analyzing only the
Debtor's intent for the purposes of the actual fraudulent
transfer claims). To require both parties to the transaction to
have actual intent, as FBK Defendants argue, would benefit the
ignorant transferee to the detriment of other creditors.

Second, Plaintiff specifically identifies four badges of
fraud to establish actual fraudulent intent:

> (i) the transfer was to an insider as the Debtors were
> directly or indirectly owned and/or controlled by [PE
> Parties]; (ii) the transfer of the Dividends to [Orchard
> Brands] and its shareholders occurred at the same time
> when substantial new debts were incurred; (iii) the
> Debtors received no value or consideration in exchange
> for the transfer of the Dividends; and (iv) the Debtors
> were or became insolvent at the time of the 2007
> Transaction and the transfer of the Dividends.

(Compl. ¶ 179) The Complaint offers myriad factual allegations
to support these statements. *See Charys Liq. Trust,* 2010 WL
2774852, *5 (denying motion to dismiss where plaintiff alleged
four badges of fraud to show debtor's actual fraudulent intent).

Here, Plaintiff adequately alleges four badges of fraud,
which permits the inference of actual fraudulent intent.
Therefore, the Motion will be denied as it pertains to
establishing actual fraudulent intent.

**b.**

Constructive fraud is analyzed under the second subsection. *See* 6 Del.C. § 1304(a)(2). The FBK Defendants argue that Plaintiff's allegations indicate that Debtors received reasonably equivalent value for the dividends. In support of this argument, the FBK Defendants note that a significant portion of the distributed funds were labeled "Return of Capital." (Compl. Ex. B) Moreover, at oral argument, FBK Defendants argued that the purchase of shares provided reasonably equivalent value for the dividends.[15]

However, Defendants have not persuaded the Court that a voluntarily disbursed dividend to preferred shareholders, even if some of the payments are a return of capital, constitutes reasonably equivalent value.[16] Defendants do not suggest that Debtors were otherwise required to return the capital, or that the total funds each Defendant received were reasonably

---

[15] The Court need not address this argument both because it was not raised in the original Motion and it is premature. *See OR v. Hunter*, 2012 WL 259411, *2 n.2 (D.N.J. 2012). The terms of the preferred stock have not been included in the pleadings. Thus, the Court has no basis to determine whether the dividend was mandatory or discretionary. Under common stock, for example, a company is not required to pay a dividend. The purchase price of the stock, therefore, could not conceivably be labeled a reasonably equivalent exchange for a dividend the company has no obligation to pay.

[16] Defendants support this argument by citing to Ponzi scheme cases where investors were able to retain transfers to the extent of their initial investments when they withdrew prior to the investment firm declaring bankruptcy. *See, e.g., Sec. Investor Protection Corp. v. Bernard L. Madoff Investment Sec., LLC*, 424 B.R. 122, *aff'd* 2011 U.S. App. Lexis 16884 (2d Cir. 2011). Those cases differ significantly, however, from the payment of a voluntary dividend.

19

equivalent to the return of capital.[17]  Accordingly, the Motion
will be denied as to the reasonably equivalent value argument.

### 3.

Third, to establish a fraudulent transfer claim, Plaintiff
must identify a "creditor holding an unsecured claim that is
allowable under section 502 of this title or that is not
allowable only under section 502(e) of this title."  11 U.S.C. §
544(b)(1).  The FBK Defendants argue that Plaintiff has failed to
identify an unsecured creditor.  The argument misreads the
Complaint.

Plaintiff has identified four types of unsecured creditors
that existed at the time of the transfer: vendors, landlords,
suppliers, and lenders.  (*See* Compl. ¶ 175)  Plaintiff need not
identify a specific unsecured creditor by name, address and phone
number even under heightened pleading standards.  *See Zazzali,*
2011 WL 607442, *5 (citing *Pardo v. Avanti Corp. Health Sys.,
Inc. (In re APF Co.)*, 274 B.R. 634, 639 (Bankr.D.Del. 2001)).
The argument has no merit and the Motion will be denied as to
this argument.

---

[17] In their Reply, the FBK Defendants slightly modify their argument.
Instead of seeking dismissal of the entire distribution, they seek only
dismissal of the fraudulent transfer claims as it applies to the return of
capital.  This argument will be disregard because it was raised for the first
time in the Reply.  *See Hunter*, 2012 WL 259411, *2 n.2.  The Court notes
again, however, that the Ponzi scheme cases FBK Defendants rely upon shed
little light on the instant dispute.

**4.**

Fourth, the FBK Defendants argue that Plaintiff has failed to satisfy the terms of § 550(a)(2), which states that the trustee may recover the value of property avoided under § 544 from "any immediate or mediate transferee of such initial transferee."  11 U.S.C. § 550(a)(2).  The FBK Defendants argue that this Court must view each part of the transaction individually and may not "collapse" the transaction.  According to this logic, the FBK Defendants received funds from non-Debtor Orchard Brands - as opposed to Debtor Appleseed Intermediate - and this fact supposedly prevents the Trustee from avoiding the transfer.[18]  The argument has no basis in law.

A plain reading of § 550(a)(2) permits recovery from immediate or mediate transferees of an interest of the Debtors in property.  The Complaint alleges that Debtor Haband paid the dividend to Appleseed's Intermediate who paid the dividend to Orchard Brands who, in turn, disbursed the dividend to Defendants as preferred shareholders.  Appleseed's Intermediate is the initial transferee, Orchard Brands is the immediate transferee and all other recipients are mediate transferees.  *See ETS Payphones, Inc. v. AT&T Universal Card (In re PSA, Inc.)*, 335

---

[18] The FBK Defendants do not argue that they are a good faith transferee within the meaning of § 550(b)(2).

21

B.R. 580, 586 (Bankr.D.Del. 2005) (illustrating the application of the statute).  The FBK Defendants can easily ascertain their transferee status from the allegations of the Complaint. Plaintiff has no obligation to apply the statute for Defendants. As a result, the Court need not reach the issue of whether the transaction should be collapsed and the Motion will be denied.

**5.**

Finally, FBK Defendants argue an exception to the trustee's avoidance powers.  Notwithstanding § 544, "the trustee may not avoid a transfer that is a . . . settlement payment . . . [made by or to] a financial institution."  11 U.S.C. § 546(e).  A settlement payment is any payment commonly used in the securities trade.  *See* 11 U.S.C. § 741(8).  The FBK Defendants argue that the dividend was a settlement payment within the meaning of § 546(e).

Although the Third Circuit has held that a payment for shares during a leveraged buyout is a settlement payment, *see Lowenschuss v. Resorts Int'l, Inc. (In re Resorts Int'l, Inc.)*, 181 F.3d 505, 515-16 (3d Cir. 1999), those transactions involved security exchanges.  The necessary implication is that both parties exchanged some value.

Here, by contrast, the dividend transaction was not an exchange, but a one-way payment.  *See* BLACK'S LAW DICTIONARY 547

22

(9th ed. 2009).[19]  As alleged, Debtors received nothing in exchange for the dividend.  While the Blair leveraged buyout may fall within the meaning of a settlement payment, the Blair acquisition cannot be conflated with the payment of the dividend. In other words, even if § 546(e) were to apply to the Blair acquisition in this multifaceted transaction, the dividend would not automatically be exempt as well.  *See Mervyn's LLC v. Lubert-Adler Group IV, LLC (In re Mervyn's Holdings, LLC)*, 426 B.R. 488, 500 (Bankr.D.Del. 2010) (Defendant's "attempt to have this Court apply section 546(e) to a single conveyance within the entire transaction is not persuasive . . . The other transactions to this sale do not fall within the parameters of section 546(e).").

Having dispensed with each argument to dismiss the actual and constructive fraudulent transfer claims, the Motions to Dismiss will be denied with respect to Counts I-VIII as to all Defendants.

### B.

Turning to the state law claims, all Defendants argue that the statute of limitations bars Counts IX-XII.  Defendants argue, and Plaintiff does not dispute, that the claims are subject to a

---

[19] *Dividend*- A portion of a company's earnings or profits distributed pro rata to its shareholders, usu. in the form of cash or additional shares.  *Id.* Ironically, the transaction at issue in this case was not financed with earnings or profits, but borrowed funds.  The transaction's label, of course, is not dispositive to these Motions.

three year statute of limitations under Delaware law.  *See* 10 Del. C. § 8106.  On the face of the Complaint, however, nearly four years elapsed between April 30, 2007, the latest possible date of accrual, and April 27, 2011, the date Plaintiff filed the Complaint.  In response, Plaintiff argues that the statute of limitations should be equitably tolled.

Ordinarily, the statute of limitations is an affirmative defense to be raised in responsive pleadings.  *See Worldcom, Inc. v. Graphnet, Inc.*, 343 F.3d 651, 657 (3d Cir. 2003) (citing *Robinson v. Johnson*, 313 F.3d 128, 135 (3d Cir. 2002) (an exception arises "only if the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations.") (emphasis omitted).  However, where more information is needed to establish the applicability of the affirmative defense, resolution of the issue in a pre-answer motion to dismiss is premature.  *Id.*

Here, Defendants correctly note that the statute of limitations would bar Plaintiff's state law claims on the face of the Complaint.  Nevertheless, Plaintiff argues that the statute of limitations should be equitably tolled.  To invoke the exception, Plaintiff would have to establish: (1) a fiduciary relationship; (2) actionable or fraudulent self-dealing; and (3) lack of inquiry notice.  *See End of the Road Trust v. Terex Corp. (In re Freuhauf Trailer Corp.)*, 250 B.R. 168, 193 (Bankr.D.Del.

24

2000).

Without so holding, the Complaint appears to establish the first two elements.[20]  Defendants take particular issue, however, with the third element - inquiry notice.[21]  Of particular importance to the resolution of this issue is whether the PIK feature of the loan delayed inquiry notice.  Although Plaintiff alleges that Debtors were insolvent as a result of the dividend, Debtors were able to stave off bankruptcy for several years.  Missed loan payments were simply added to the principal to avoid default.  This feature may have caused both Debtors and creditors to lack inquiry notice.

Nevertheless, at this stage of the litigation, the record is not sufficiently developed to determine the applicability of equitable tolling.  It would be unfair to require Plaintiff to plead facts sufficient to account for every affirmative defense and exception thereto in the Complaint.  The Court offers no opinion as to the merits of a future statute of limitations argument.  Accordingly, the Motion will be denied without prejudice to renew the statute of limitations argument in the

---

[20] At this stage of the litigation, it is unclear whether Plaintiff will be able to establish that each Defendant was in a fiduciary relationship with the Debtors.

[21] The parties disagree whether creditors, debtors, or both must be on inquiry notice to satisfy the statute.  The Court need not resolve that dispute for the purposes of the instant Motion.  The Court merely notes that if the Debtors are required to have inquiry notice, then there arises a seemingly anomalous situation where the Debtors would be expected to sue their parent company to toll the statute of limitations.

future.

## C.

Finally, the FBK Defendants argue that Plaintiff has failed to adequately plead corporate waste (Count XI) because Debtors received at least some consideration.  To establish the claim, Plaintiff must show "an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade." *Weiss v. Swanson*, 948 A.2d 433, 450 (Del.Ch. 2008).  "Such a transfer is in effect a gift."  *Brehm v. Eisner*, 746 A.2d 244, 263 (Del. 2000).  Corporate waste claims are reserved only for the "rare unconscionable case where directors irrationally squander or give away corporate assets."  *Binks v. DSL.net, Inc.*, 2010 WL 1713629, * 12 (Del.Ch. 2010).

Here, Plaintiff alleges that the PE Parties caused Debtors to issue a dividend financed by loans collateralized with Debtors' assets.  Plaintiff further alleges that Debtors received no benefit from the transaction.  (*E.g.*, Compl. ¶¶ 2, 260)  Indeed, the dividend, by definition, provided no substantial benefit to the corporation, but instead benefitted the shareholders.  Although the Debtors received approximately $650 million pursuant to the Senior Credit Facilities, Defendants appropriated a large portion of the funds for themselves while

returning no value to the corporation.[22]   Accordingly, the Motion will be denied.[23]

### D.

Before this Court granted FBK Defendants' Motion to Withdraw the Reference, the Bankruptcy Court granted various parties' motions to file papers under seal.  Only Plaintiff's Motion to Seal remains.

Although this adversary proceeding is being litigated in District Court, "[t]he Bankruptcy Rules and Forms govern procedure in cases under Title 11 of the United States Code." Bankr.R. 1001.  The Federal Rules of Civil Procedure "apply to bankruptcy proceedings to the extent provided by the Federal Rules of Bankruptcy Procedure."  Fed.R.Civ.P. 81(a)(2). Bankruptcy Rule 7026 expressly makes Fed.R.Civ.P. 26 applicable to this proceeding.

Fed.R.Civ.P. 26(c) provides that "[t]he court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or

---

[22] Ironically, it was the FBK Defendants that argued that the transaction could not be collapsed in the context of § 544.  Now, the FBK Defendants wish to view the same transaction as a whole to establish that Debtors received at least some consideration.

[23] For the first time in their Reply, the FBK Defendants argue that only fiduciaries may be liable for claims of corporate waste.  The Court will not address this untimely argument.  The Court notes, however, that to avoid dismissal upon future Motion, Plaintiff may need to amend the Complaint.

27

expense."  Good cause may be established "on a showing that disclosure will work a clearly defined and serious injury to the party seeking closure.  The injury must be shown with specificity." *Pansy v. Borough of Stroudburg*, 23 F.3d 772, 786 (3d Cir. 1994) (quoting *Publicker Indus., Inc. v. Cohen,* 733 F.2d 1059, 1071 (3d Cir. 1984).  Plaintiff must show good cause notwithstanding the parties' confidentiality agreements.  *Id.* at 786.  Any previous application of § 107(b) or Bankr.R. 9018 to this adversary proceeding - rules that do not require a showing of good cause - was erroneous.

Here, Plaintiff has applied for an order sealing his brief wholesale, but makes no attempt to establish good cause.  This application falls well short of the specificity a good cause showing requires.  After review of the documents in this case, the Court has not discovered any sensitive material, such as trade secrets, that would commonly satisfy the good cause standard.  Accordingly, Plaintiff's Motion to Seal will be denied and all prior orders sealing documents in this adversary proceeding will be vacated.[24]

## IV.

For the foregoing reasons the Motion to Dismiss will be

---

[24] The parties have leave to file future motions to seal or renew prior applications.  Such motions shall clearly identify each document to be sealed and the reasons good cause can be shown.

denied.


Dated: 3/1/12                         ___/s/ Joseph E. Irenas___

                                      **JOSEPH E. IRENAS, S.U.S.D.J**